**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| LANNETT COMPANY, INC., *et al.*,[1] | ) ) ) | Case No. 23-10559 (___) |
| Debtors. | ) ) ) | (Joint Administration Requested) |

**MOTION OF DEBTORS FOR ENTRY
OF INTERIM AND FINAL ORDERS (I) AUTHORIZING
THE DEBTORS TO (A) MAINTAIN AND ADMINISTER THEIR
CUSTOMER PROGRAMS AND (B) HONOR CERTAIN PREPETITION
OBLIGATIONS RELATED THERETO, AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion:[2]

**Relief Requested**

1. The Debtors seek entry of interim and final orders, substantially in the form attached hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and "Final Order"), (a) authorizing the Debtors to (i) maintain and administer their Customer Programs (as defined herein) and (ii) honor certain prepetition obligations related thereto; and (b) granting related relief. In addition, the Debtors request that the Court schedule a final hearing within approximately 35 days after the commencement of these chapter 11 cases to consider entry of the Final Order.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Lannett Company, Inc. (7699); Silarx Pharmaceuticals, Inc. (1798); Cody Laboratories, Inc. (1425); and Kremers Urban Pharmaceuticals Inc. (0780). The location of the Debtors' service address is: 1150 Northbrook Drive, Suite 155, Trevose, Pennsylvania 19053.

[2] A detailed description of the Debtors and their businesses, including the facts and circumstances giving rise to the Debtors' chapter 11 cases, is set forth in the *Declaration of Timothy C. Crew, Chief Executive Officer of Lannett Company, Inc. in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously herewith. Capitalized terms used but not defined in this motion have the meanings ascribed to them in the First Day Declaration or in the contemporaneously filed *Joint Prepackaged Chapter 11 Plan of Reorganization of Lannett Company, Inc. and Its Debtor Affiliates* (as amended, supplemented, or otherwise modified from time to time, the "Plan"), as applicable.

**Jurisdiction and Venue**

2. The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. The Debtors confirm their consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The statutory bases for the relief requested herein are sections 105(a) and 363(b) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), rules 2002, 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1 and 9013-1.

**Background**

5. The Debtors, together with their non-Debtor affiliates (collectively, "LCI" or the "Company"), are a mid-sized developer, manufacturer, marketer, and distributor of generic versions of pharmaceutical medicines that address a wide range of therapeutic areas. Headquartered in Trevose, Pennsylvania, LCI employs approximately 500 individuals. The Company's customers include direct purchasers such as generic pharmaceutical distributors, drug wholesalers, chain drug retailers, private label distributors, mail-order pharmacies, managed care organizations, hospital buying groups, governmental entities, and health maintenance organizations.

6.     As described in the First Day Declaration, the Debtors filed these prepackaged chapter 11 cases with a Restructuring Support Agreement in place with holders of over 80 percent of the Company's First Lien Senior Secured Notes and holders of 100 percent of the Company's Second Lien Term Loan.  The Debtors started soliciting votes on the Plan on May 2, 2023.

7.     Later on May 2, 2023 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors have also filed a motion requesting joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases and no official committees have been appointed or designated.

### The Debtors' Customer Programs

8.     The Debtors historically have provided certain incentives, discounts, and accommodations to their customers to attract and maintain positive customer relationships, the majority of which do not independently entail the expenditure of cash (such programs, as described below, collectively, the "Customer Programs").[3]  The Debtors believe that their ability to continue the Customer Programs and to honor any obligations thereunder in the ordinary course of business is necessary to retain their reputation for reliability, comply with their legal obligations, meet competitive market pressures, and ensure customer satisfaction as most of the Company's business is discretionary.  Continuing the Customer Programs allows the Debtors to maintain the goodwill

---

[3] Although the description of the Customer Programs set forth in this motion is intended to be comprehensive, the Debtors may have inadvertently omitted some of the Customer Programs.  The Debtors request relief with regards to all Customer Programs, regardless of whether any individual Customer Program is specifically identified herein.

of their current customers, attract new customers, and, ultimately, enhance their businesses' revenue and profitability to the benefit of all of the Debtors' stakeholders. Moreover, because obligations to all trade creditors are expected to be reinstated pursuant to the Plan or paid in full pursuant to the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Payment of All Accounts Payable Claims in the Ordinary Course of Business, (II) Granting Administrative Expense Priority to Undisputed Obligations on Account of Outstanding Orders, (III) Authorizing Satisfaction of Obligations Related Thereto, and (IV) Granting Related Relief* filed contemporaneously herewith, the Debtors believe that no creditor will be harmed by the Debtors' continuance of the Customer Programs.

9.  As of the Petition Date, the Debtors estimate that there are approximately $126 million of prepetition obligations outstanding related to Customer Programs, of which $104 million are on account of prepayments that do not entail cash expenditure, but represent a future obligation of performance of the Company. These obligations include (a) rebates, (b) chargebacks, (c) shelf-stock adjustments and pricing protections, (d) failure to supply adjustments; and (e) billing adjustments, credits and refunds, and returns owing to customers and certain third parties. By this motion, the Debtors seek authorization, but not direction, to maintain the Customer Programs in the ordinary course of business and to continue to honor all customer-related obligations, including paying any prepetition obligations associated therewith.

**II.  Rebates.**

10.  In the ordinary course of business, the Debtors have contracts that provide key chain drug stores, distributors, retailers, and wholesale customers with rebates (the "Rebates"). Through the Rebate incentives, the Debtors provide customers with cash payments or credits that may be applied to future purchase orders. Such customers receive the Rebates upon purchasing, selling, and promoting the Debtors' products, negotiating product rewards, bid processes, and

volumes, tracking product sales and discounts, or upon the attainment of pre-established volumes or net sales milestones for a specified period. Customers that purchase products directly from the Debtors receive Rebates in the form of credits while indirect customers that purchase the Debtors' products through a third-party receive Rebates in the form of cash because they do not have accounts with the Debtors to which credits could be applied. Rebates that are provided in the form of credits, which constitute the majority of the Rebates, do not entail the expenditure of the Debtors' cash, but rather signify obligations of future performance on account of the Rebates.

11.     The Debtors also routinely offer Rebates under the terms of its contracts with group purchasing organizations (each, a "<u>GPO</u>") to sell their products to their members. Pursuant to certain contracts (collectively, the "<u>GPO Contracts</u>") with such GPOs, each GPO earns a Rebate based on a percentage of the Debtors' sales to the GPO's respective members. Currently, the Debtors are party to GPO Contracts with approximately ten GPOs, most of which are healthcare and pharmaceutical networks.

12.     The Rebates foster customer loyalty and provide incentives for chain drug stores, retailers, distributors, and wholesale customers to purchase and promote the Debtors' products. The Debtors' ability to continue the Rebates and to honor the obligations thereunder in the ordinary course of business is critically important to the Debtors' reputation and the uninterrupted distribution of their products to customers. Without the ability to continue offering Rebates, the Debtors expect that many of such customers may be unwilling to transact with the Debtors or purchase at high volumes, which could lead to a decline in revenues, the ultimate cost of which would be borne by the Debtors' estates. Specifically, such a result with respect to the GPO Contracts would be vastly detrimental to the Debtors' estates as net sales to the Debtors' largest

GPOs accounted for 72 percent of total net sales in fiscal year 2022 and 73 percent in fiscal year 2021.

13. The Debtors estimate that they remit approximately $55.8 million annually in Rebate obligations. As of the Petition Date, the Debtors estimate that approximately $29 million in Rebates are reflected in the Debtors' accounting systems, of which the Debtors anticipate approximately $10.8 million will be due and owing during the first 35 days of the Debtors' chapter 11 cases. The Debtors seek authorization to honor any prepetition Rebates and continue processing Rebates in the ordinary course of business on a postpetition basis consistent with their historical practices.[4]

### III. Chargebacks.

14. The Debtors sell their products directly to wholesale distributors, generic distributors, retail pharmacy chains, and mail order pharmacies. The Debtors also sell its products indirectly to independent pharmacies, managed care organization, hospitals, nursing homes, and group purchasing organizations (collectively, the "Indirect Customers"). The Debtors enter into agreements with Indirect Customers to establish pricing for certain products. In turn, Indirect Customers independently select a wholesaler from which to buy the Debtors' products, at the contractually agreed price with the Debtors. If the price paid by the Indirect Customer to the wholesaler is lower than the price paid by the wholesaler to the Debtors, the Debtors will provide a credit, or "chargeback," to the wholesaler for the difference between the contractual price with the Indirect Customer and the purchase price paid by the wholesaler (the "Chargebacks"). As such,

---

[4] The Debtors participate in certain government-mandated rebate programs, such as Medicaid, Medicare, and Tricare, under which the Debtors pay rebates directly to the applicable U.S. government agencies rather than the Debtors' customers. For the avoidance of doubt, the Debtors seek authorization to honor such prepetition Rebates and continue processing such Rebates in the ordinary course of business on a postpetition basis consistent with their historical practices.

Chargebacks do not entail the expenditure of the Debtors' cash, but rather signify obligations of future performance on account of the Chargebacks.

15. Incentives such as the Debtors' Chargebacks are commonly offered to customers by competitors of the Debtors and are critical to retaining the Debtors' customer base. Without Chargebacks, the Debtors anticipate that customers may be unwilling to purchase the Debtors' products, which would cause a decline in revenues to the detriment of the Debtors' estates. The Debtors' ability to continue the Chargebacks and to honor the obligations thereunder in the ordinary course of business is critically important to the Debtors' ability to distribute their products to customers and maintaining their reputation.

16. The Debtors estimate that they remit approximately $386 million annually in Chargeback obligations. As of the Petition Date, the Debtors estimate that approximately $42.7 million in Chargebacks are reflected in the Debtors' accounting system, of which the Debtors anticipate approximately $36.5 million will be due and owing during the first 35 days of the Debtors' chapter 11 cases. Accordingly, the Debtors seek authorization to honor any prepetition Chargebacks and to continue honoring their obligations in connection with Chargebacks in the ordinary course of business and consistent with historical practices.

**IV.     Shelf-Stock Adjustments and Price Protections.**

17. From time to time, in the ordinary course of business, the Debtors provide their customers with cash or credits issued to adjust such customers' purchase price in the event of increases or decreases in the prices of the Company's products. In the event the price of a product purchased from the Debtors decreases, a credit is granted for the price difference if such product remains in customers' inventories at the time of the price reduction (the "Shelf-Stock Adjustments"). In the event the price of a product purchased from the Debtors increases, a credit is similarly granted, effectively allowing customers to purchase products at previous prices for a

specified period of time (the "Price Protections"). While most of the Shelf-Stock Adjustments and Price Protections are issued as credits to the Debtors' direct customers, the Debtors also issue such adjustments in cash to a small minority of indirect customers who do not pay the Debtors directly. As such, most Shelf-Stock Adjustments and Price Protections do not entail the expenditure of the Debtors' cash, but rather signify obligations of future performance on account of the Chargebacks.

18. The Shelf-Stock Adjustments and Price Protections ensure that the impact of price fluctuation remains limited and, as such, foster customer loyalty and provide incentives for customers to purchase the Debtors' products. Without the ability to continue offering such incentives, the Debtors expect that many customers may be unwilling to transact with the Debtors, to the detriment of the Debtors' estates.

19. The Debtors estimate that they remit approximately $11 million annually in Shelf-Stock Adjustments and Price Protections obligations. As of the Petition Date, the Debtors estimate that approximately $4.6 million are reflected in the Debtors' accounting system on account of Shelf-Stock Adjustments and Price Protections, of which the Debtors anticipate approximately $1 million will be due and owing during the first 35 days of the Debtors' chapter 11 cases. The Debtors seek authorization to honor prepetition Shelf-Stock Adjustments and Price Protections obligations and continue to provide and honor such Shelf-Stock Adjustments and Price Protections on a postpetition basis in the ordinary course of business and consistent with historical practices.

**V.    Failure to Supply Adjustments.**

20. From time to time, in the ordinary course of business, the Debtors may be invoiced by certain of their customers when the Debtors are not able to fulfill certain contractual service requirements, such as fulfilling a required percentage of orders or meeting certain delivery

8

requirements. Additionally, if the Debtors' products are backordered, customers may invoice the Debtors for re-procurement charges resulting from the customers' needing to purchase products from an alternate supplier at a higher price (collectively, the "Failure to Supply Adjustments"). Such adjustments can be issued as credits to the customer's account or as cash payments.

21. The Failure to Supply Adjustments ensure that the impact of supply disruptions remains limited and, as such, foster customer loyalty and provide a guarantee that customers can secure requested volumes of the Debtors' products at agreed-upon pricing. Without the ability to continue offering such incentives, the Debtors' customers may be unwilling to transact with the Debtors, to the detriment of the Debtors' estates.

22. The Debtors estimate that they remit approximately $1.87 million annually in Failure to Supply Adjustments. As of the Petition Date, the Debtors estimate that approximately $4.2 million are reflected in the Debtors' accounting system on account of Failure to Supply Adjustments, of which the Debtors anticipate approximately $1.7 million of such credits and payments will be due and owing during the first 35 days of the Debtors' chapter 11 cases. The Debtors seek authorization to honor prepetition Failure to Supply Adjustments and continue to provide and honor such Failure to Supply Adjustments on a postpetition basis in the ordinary course of business and consistent with historical practices.

**VI.     Billing Adjustments, Credits and Refunds, and Returns.**

23. Billing Adjustments. From time to time, in the ordinary course of business, the Debtors provide accommodations to their customers in connection with the collection of outstanding balances, including but not limited to, extending payment terms and providing cash discounts for prompt payment. The Debtors provide these adjustments and accommodations to their customers in an effort to maintain customer satisfaction and retain customer loyalty.

9

The Debtors seek authorization to continue to provide and honor billing adjustments and accommodations, including satisfying any prepetition billing adjustments and accommodations on a postpetition basis in the ordinary course of business and consistent with historical practices.

24.     <u>Credits and Refunds</u>.  In the ordinary course of business, the Debtors' customers may from time to time have a credit balance on their account with the Debtors (collectively, the "<u>Credits</u>").  For the convenience of customers, the Debtors typically apply the Credits to the customers' subsequent purchases.  As a result, a customer's account will not typically show that Credits have been applied unless the amount of Credits exceeds the customer's accounts receivable balance, resulting in a credit balance on the customer's account.

25.     Upon request, the Debtors may issue a refund check on account of the Credits.  As of the Petition Date, some refund checks issued to customers may not have been presented for payment or may not have cleared the banking system and, accordingly, have not been honored and paid as of the Petition Date.

26.     The Debtors estimate that as of the Petition Date, approximately 27 customers have credit balances on account of Credits.  The total amount owed to customers on account of such credit balances is approximately $315,000, none of which the Debtors anticipate will be due and owing during the first 35 days of the Debtors' chapter 11 cases.  The Debtors seek authorization to continue to apply Credits to customers' accounts and issue and pay refund checks on account of Credits, including issuing and paying refunds, if any, resulting from prepetition transactions on a postpetition basis in the ordinary course of business and consistent with historical practices.

27.     <u>Returns</u>.  Consistent with industry practice, the Debtors have a product return policy that allows customers to return products (the "<u>Return Policy</u>").  In accordance with the Return Policy, the Debtors accept returns prior to and up to twelve months past the product's

expiration date. A product may only be returned if the customer obtains pre-approval from the Debtors. In the event a customer is entitled to a return pursuant to the Return Policy, the customer receives a credit to be applied to future purchases (the "Return Credits").

28. As of the Petition Date, the Debtors estimate that approximately $36 million in Return Credits remain outstanding, of which the Debtors anticipate approximately $2.1 million will be due and owing during the first 35 days of the Debtors' chapter 11 cases. The Debtors seek authorization to honor their prepetition obligations under the Return Policy, including payment of the Return Credits, and to continue to honor such obligations on a postpetition basis in the ordinary course of business and consistent with historical practices.

## Basis for Relief

29. Courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. *See, e.g.*, *In re Just for Feet, Inc.*, 242 B.R. 821, 825–26 (D. Del. 1999); *see also In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002); *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175–76 (Bankr. S.D.N.Y. 1989); *Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 398 (S.D.N.Y. 1983). In so doing, these courts acknowledge that several legal theories rooted in sections 105(a) and 363(b) of the Bankruptcy Code support the payment of prepetition claims.

30. Section 363(b) of the Bankruptcy Code permits a bankruptcy court, after notice and a hearing, to authorize a debtor to "use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). "In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions." *Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147, 153 (D. Del. 1999)

(collecting cases); *see also Armstrong World*, 29 B.R. at 397 (relying on section 363 to allow contractor to pay prepetition claims of suppliers who were potential lien claimants because the payments were necessary for general contractors to release funds owed to debtors); *In re Ionosphere Clubs*, 98 B.R. at 175 (finding that a sound business justification existed to justify payment of certain prepetition wages); *In re Phx. Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (requiring the debtor to show a "good business reason" for a proposed transaction under section 363(b)).

31. Courts also authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code. Section 105(a) of the Bankruptcy Code codifies a bankruptcy court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Under section 105(a), courts may authorize pre-plan payments of prepetition obligations when essential to the continued operation of a debtor's businesses. *See In re Just for Feet*, 242 B.R. at 825−26. Specifically, a court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity"). *See, e.g.*, *In re Ionosphere Clubs*, 98 B.R. at 176; *In re Lehigh & New England Ry Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (stating that courts may authorize payment of prepetition claims when there "is the possibility that the creditor will employ an immediate economic sanction, failing such payment"); *see also In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (noting that, in the Third Circuit, debtors may pay prepetition claims that are essential to the continued operation of the business). A bankruptcy court's use of its equitable powers to "authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *In re Ionosphere Clubs*,

Case 23-10559-JKS    Doc 10    Filed 05/03/23    Page 13 of 18

98 B.R. at 175–76 (citing *Miltenberger v. Logansport, C. & S.W. Ry. Co.*, 106 U.S. 286 (1882)). Indeed, at least one court has recognized that there are instances when a debtor's fiduciary duty can "only be fulfilled by the preplan satisfaction of a prepetition claim." *In re CoServ*, 273 B.R. at 497.

33. Continuing to administer the Customer Programs without interruption during the pendency of these chapter 11 cases is vital to preserve the Debtors' valuable customer relationships and goodwill, and to maintain business and drive additional business, which will inure to the benefit of all of the Debtors' stakeholders and their estates. If the Debtors are unable to continue the Customer Programs postpetition or pay amounts due and fulfill obligations owing on account of the Customer Programs, the Debtors risk alienating certain customer constituencies (who might then initiate business relationships with the Debtors' competitors) and suffer corresponding losses in customer loyalty that will harm the Debtors' prospects for reorganization or otherwise damage the value of the estates. Importantly, the Debtors' competitors maintain programs similar to the Customer Programs, meaning that customers have a ready audience willing to meet their needs and take business away from the Debtors at this crucial time.

33. Failure to honor the Customer Programs could place the Debtors at a competitive disadvantage in the marketplace, amplifying the negative effect of any customer uncertainty that may arise from these chapter 11 cases. Such uncertainty could erode the Debtors' hard-earned reputation and brand loyalty, which could adversely impact their prospects for a successful emergence from bankruptcy. Maintaining the Customer Programs and the corresponding relationships will ensure a smooth transition immediately following the filing of these chapter 11 cases. Accordingly, the Debtors submit that they have shown sufficient cause to warrant the authority to honor the Customer Programs and to honor any customer obligations relating thereto.

13

34. Where, as here, retaining the loyalty and patronage of customers is critical to the success of chapter 11 cases, courts in this district and others have granted relief similar to that requested herein. *See, e.g.*, *In re Carestream Health, Inc.*, No. 22-10778 (AJL) (Bankr. D. Del. Aug. 24, 2022) (authorizing the debtors to honor customer-related obligations in the ordinary course of business and to honor prepetition obligations related to same); *In re Riverbed Tech., Inc.*, No. 21-11503 (CTG) (Bankr. D. Del. Nov. 18, 2021) (same); *In re Alex and Ani, LLC*, No. 21-10918 (CTG) (Bankr. D. Del. July 14, 2021) (same); *In re Town Sports Int'l, LLC*, No. 20-12168 (CSS) (Bankr. D. Del. Sept. 16, 2020) (same); *In re APC Auto. Techs. Intermediate Holdings, LLC*, No. 20-11466 (CSS) (Bankr. D. Del. June 23, 2020) (same).[5]

### **Processing of Checks and Electronic Fund Transfers Should Be Authorized**

35. The Debtors have sufficient funds to pay the amounts described in this motion in the ordinary course of business by virtue of expected cash flows from ongoing business operations and anticipated access to cash collateral. In addition, under the Debtors' existing cash management system, the Debtors can readily identify checks or wire transfer requests as relating to any authorized payment in respect of the relief requested herein. Accordingly, the Debtors believe that checks or wire transfer requests, other than those relating to authorized payments, will not be honored inadvertently. Therefore, the Debtors respectfully request that the Court authorize all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this motion.

---

[5] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

**The Requirements of Bankruptcy Rule 6003 Are Satisfied**

36.     Bankruptcy Rule 6003 empowers a court to grant certain relief within the first 21 days after the petition date only "to the extent that relief is necessary to avoid immediate and irreparable harm."  For the reasons discussed above, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations, and the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this important juncture.  The requested relief is necessary for the Debtors to operate their businesses in the ordinary course, preserve the ongoing value of their operations, and maximize the value of their estates for the benefit of all stakeholders.  The Debtors have demonstrated that the requested relief is "necessary to avoid immediate and irreparable harm," as contemplated by Bankruptcy Rule 6003, and the Court should grant the requested relief.

**Reservation of Rights**

37.     Nothing contained in this motion or any order granting the relief requested in this motion, and no action taken pursuant to the relief requested or granted (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in this motion or any order granting the relief requested by this motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or

(g) a waiver or limitation of any claims, causes of action or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law.  If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

### **Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

38.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### **Notice**

39.     The Debtors will provide notice of this motion to the following parties or their respective counsel:  (a) the U.S. Trustee for the District of Delaware; (b) the holders of the thirty largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the First Lien Agent; (d) counsel to the Second Lien Agent; (e) counsel to the Crossover Group; (f) counsel to the issuer of the Existing Letters of Credit; (g) the office of the attorney general for each of the states in which the Debtors operate; (h) the United States Attorney's Office for the District of Delaware; (i) the Internal Revenue Service; and (j) any party that has requested notice pursuant to Bankruptcy Rule 2002.  As this motion is seeking "first day" relief, within two business days of the hearing on this motion, the Debtors will serve copies of this motion and any order entered in respect to this motion as required by Local Rule 9013-1(m).  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

16

**No Prior Request**

40. No prior request for the relief sought in this motion has been made to this or any other court.

[*Remainder of page intentionally left blank*]

WHEREFORE, the Debtors respectfully request entry of the Interim Order and Final Order, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B,** respectively, (a) granting the relief requested herein and (b) granting such other relief as is just and proper.

| | |
|---|---|
| Dated: May 3, 2023<br>Wilmington, Delaware | */s/ Howard A. Cohen*<br>Howard A. Cohen (DE Bar No. 4082)<br>Stephanie J. Slater (DE Bar No. 6922)<br>**FOX ROTHSCHILD LLP**<br>919 North Market Street<br>Suite 300<br>Wilmington, Delaware 19899<br>Telephone:    (302) 654-7444<br>Facsimile:     (302) 656-8920<br>Email:            hcohen@foxrothschild.com<br>                      sslater@foxrothschild.com<br><br>-and-<br><br>Nicole L. Greenblatt, P.C. (*pro hac vice* pending)<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>601 Lexington Avenue<br>New York, New York 10022<br>Telephone:    (212) 446-4800<br>Facsimile:     (212) 446-4900<br>Email:            nicole.greenblatt@kirkland.com<br><br>-and-<br><br>Joshua M. Altman (*pro hac vice* pending)<br>**KIRKLAND & ELLIS LLP**<br>**KIRKLAND & ELLIS INTERNATIONAL LLP**<br>300 North LaSalle Street<br>Chicago, Illinois 60654<br>Telephone:    (312) 862-2000<br>Facsimile:     (312) 862-2200<br>Email:            josh.altman@kirkland.com<br><br>*Proposed Co-Counsel for the Debtors and Debtors in Possession* |